IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION

Peggy Ann Eubanks,     :  Case No. 3:09CV1345

 Plaintiff,      :

   vs.      :

Commissioner of Social Security,  :  **MAGISTRATE'S REPORT AND**
            **RECOMMENDATION**

 Defendant.

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). Pending are the parties' Briefs on the Merits and Plaintiff's Reply Brief (Docket Nos. 13, 16 and 17). For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the recommendation to the Magistrate.

## PROCEDURAL BACKGROUND

On January 23, 2006, Plaintiff filed an application for DIB, alleging that she had been disabled since July 31, 2002 (Tr. 49-53). The application for DIB was denied initially and upon reconsideration (Tr. 42-44 and 46-47). A hearing was conducted on October 7, 2008, before Administrative Law Judge (ALJ) Barbara Beran (Tr. 266). Plaintiff, represented by counsel, Vocational Expert (VE) Dr. W. Bruce Walsh

and Medical Expert (ME) Dr. Denise Davis, appeared and testified (Tr. 266).  On February 4, 2009, the

ALJ concluded that Plaintiff was not entitled to a period of disability and DIB (Tr. 10-29).  The ALJ's

decision became the final decision of the agency when the Appeals Council denied review on May 14, 2009

(Tr. 5-7).  An action in this Court seeking judicial review of the Commissioner's decision denying benefits

was timely filed.

## FACTUAL BACKGROUND

### Plaintiff's Testimony

At the hearing, Plaintiff testified that she was married and resided with her spouse who was employed.

After completing high school, Plaintiff attended truck driving school.  She was 48 years old,  5'2" tall and

weighed 208 pounds.  Plaintiff  had gained approximately forty pounds over the last two years (Tr. 270-

71).

Plaintiff had a valid driver's license and drove about  once every other day to her niece's home or to

the grocery store.  Since her disability began in 2002, Plaintiff only traveled outside her hometown area

once or twice a year to visit  her mother near Marietta, Ohio.  For about a year, she and her husband tried

to operate an antique business.  She tried to work about twenty hours a week in the business, but usually

worked only few hours daily (Tr. 273, 299).

For about four to six months, Plaintiff worked at Innovative Support, a home health care provider,

transporting clients to appointments and supervising their chores and preparing their meals (Tr. 276).

Approximately 25 percent of Plaintiff's job consisted of actually transporting clients.  When she was not

driving clients, Plaintiff sat for half of the time and stood for half of the time.  She was not required to lift

or carry anything.  Plaintiff had trouble getting to work on time in the morning.  Due to Plaintiff's tardiness,

clients were late for or missed their medical appointments.  Consequently, Plaintiff quit her job (Tr. 276-

77).

After Plaintiff quit her job at Innovative Support, she began working as a telephone solicitor.  Plaintiff worked as a telephone solicitor for approximately one and half years.  Plaintiff sat while at work and was not required to lift or carry anything (Tr. 277-278).  Plaintiff began having problems at the job because she took long  restroom breaks, often caused by leaks at Plaintiff's stoma site.  Such problems caused Plaintiff to have to leave the job site a few times per week.  Even though Plaintiff's boss was understanding, she quit the job (Tr. 299-303).

Plaintiff next worked as a semi truck driver.  Plaintiff drove across state lines, kept a log book, and was required to load and unload the truck if nobody else was available to do so.  During the process of loading and unloading, Plaintiff was, at times, required to lift up to 80 pounds (Tr. 278).

When testifying about the medical issues that impaired her ability to work, Plaintiff stated that her worst medical problem was the pain associated with her ileostomy (a surgical opening that brings an end of the small intestine to the surface of one's skin).  Plaintiff experienced pain from the ileostomy all the time.  At the time of her testimony and for the eighteen months prior, Plaintiff's pain level was a seven on a scale from one to ten, with one representing minimal pain and ten being the worst pain possible (Tr. 279-281).  Additionally, Plaintiff had a nodule surrounded by open ulcers on her side.  The ulcers were not healing because she reused her ostomy supplies.  Plaintiff did not replace her ostomy supplies because they cost $250 per month and she was unable to afford them (Tr. 279-280).

Plaintiff also experienced persistent back/rectal pain.  Prior to the July 2007 car accident, Plaintiff experienced rectal pain, however, the accident created back problems which made her rectal pain worse.  Her back/rectal pain level was a seven or eight on a scale from one to ten, with one representing minimal pain and ten being the worst pain possible.  Plaintiff was only able to sit for half an hour before finding it

necessary to get up and walk around. (Tr. 282-283).

Plaintiff had problems associated with psoriasis at the time of her testimony and for several years earlier.  Over the course of several years, her problems worsened.  At time of the testimony and for the two and half years prior to the testimony, Plaintiff had outbreaks seven to eight months per year.  The psoriasis caused both itchiness and pain in her left leg which rated at a seven on a scale from one to ten, with one representing minimal pain and ten being the worst pain possible. (Tr. 284-286).

Additionally, Plaintiff had problems associated with anxiety and depression that began approximately two and a half years prior to the hearing.  The symptoms of her anxiety and depression worsened when Plaintiff was stressed.  Plaintiff experienced stress for several reasons: people pointed out her psoriasis and questioned her about it;  she was unable to buy her ostomy supplies;  she had to take care of the site of her ileostomy, and  her mother's age prevented her mother from helping her (Tr. 286-287).

Plaintiff also had trouble sleeping because she could not lay on her back.  On average, Plaintiff slept for four hours every night and then four hours throughout the day (Tr. 302).

As treatment, Plaintiff was prescribed several medications and given other medical advice.  Plaintiff's list of medication included a new medication to treat her diabetes and Percocet, which had the side effect of making Plaintiff sleepy and caused her to refrain from driving.  Her doctors additionally recommended weight loss, Epsom salt soaks as often as possible, and a small amount of walking (Tr. 287-290).

Plaintiff was able to both sit and stand for half an hour without a problem.  Plaintiff could walk for 15 minutes at a time and could lift approximately three pounds.  Plaintiff had been dealing with these limitations at the time of the hearing and for two years prior to the hearing.  Plaintiff was able to bathe herself, if she had assistance getting in and out of the bathtub.  She was able to dress herself, but was unable to put her socks and shoes on as bending over aggravating her back/rectal pain.  Plaintiff was able to make

4

her bed when she had a good day, which occurred approximately three days per week. She prepared meals and did the dishes once per day.  She was able to do laundry, if she had assistance lifting the clothes into the washer.  Plaintiff was also able to dust and did so once per week.  If  she had assistance, Plaintiff was able to grocery shop and did so twice per week.  Plaintiff also went shopping for clothing or other items once  weekly.  Plaintiff was unable to iron, sweep, mop, vacuum, take out the trash, mow the grass, garden, remove weeds, or shovel (Tr. 290-294).

In order to entertain herself, Plaintiff read newspapers, watched approximately two hours of television daily, completed word search puzzles, went to see movies approximately twice per year, and went out to eat approximately once a week.  Additionally, Plaintiff had visits from her church friends every day.  Her brother visited twice a month and her nephew visited and helped Plaintiff four to six times per month.  In the few years before her testimony, Plaintiff gave up many hobbies including an antique craft association, crocheting, and collecting antiques.  Plaintiff's hobbies, at the time of her testimony, included collecting coupons, taking her niece and nephews for cookie breaks, and attending school activities of her niece and nephew (Tr. 294-98).

On average, Plaintiff experienced three good days per week in which she was able to perform the various aforementioned tasks (Tr. 291).  However, on bad days, Plaintiff ached all over, felt like she had the flu, and was usually unable to do anything but sit in her recliner (Tr. 301).

**The ME's Testimony**

The ME stated that Plaintiff had some osteoarthritis in her cervical spine and lumbosacral spine, arthritis in her right shoulder, psoriasis, obesity and diabetes mellitus.  Plaintiff's additional medical issues included the removal of her rectum and an ileostomy.  While the Plaintiff had not been compliant with her physician' instructions because she was reusing her ostomy supplies, there were no further indications that

5

the Plaintiff was noncompliant (Tr. 303-305).

Because of the Plaintiff's physical impairments, the ME indicated that she would limit the Plaintiff to sedentary work.  Additionally, Plaintiff would be limited to thirty minutes of sitting and thirty minutes of standing and walking.  However, the ME testified that Plaintiff would be able to sit through an eight-hour work day and would be able to stand and/or walk for two hours throughout the eight-hour work day. Plaintiff would have no hand or foot control limitations and no environmental limitations.  She would need to limit her bending, squatting, and stooping, and only perform those activities on occasion. Plaintiff would not be able to crawl, climb ladders or scaffolds, or reach over her head (Tr. 305-06).

The problems that Plaintiff was having with her ileostomy, including the leaking, the nodule, and skin breakdown around the area, were caused by Plaintiff's reuse of the ostomy supplies.  Thus, the ME opined that Plaintiff's problems with her ileostomy would be relieved if Plaintiff followed the prescribed treatment (Tr. 307-308).

### The VE's Testimony

The VE classified each of the jobs in Plaintiff's work history.  Her job working at Innovative Support as a home health aid was performed as light in strength and semi-skilled.  According to the DOT, the job would be classified as medium and semi-skilled.  As a truck diver, Plaintiff performed her job as heavy and semi-skilled.  The job would be described as medium and semi-skilled by the DOT, with the difference being the loading and unloading.  As a telephone solicitor, Plaintiff performed her job within the classification of sedentary in strength and semi-skilled, with a specific vocational preparation time of more than one month and up to and including three months.  Her telemarketing job was performed within the same classification as described by the DOT as sedentary and semi-skilled (Tr. 310).

The VE opined that Plaintiff could perform her past work as a telephone solicitor with her current

6

limitations as described by the ME.  She could perform the telemarketing job at the same level she had previously performed it, which is the level at which is it generally performed according to the DOT (Tr. 310).

However, the VE found that given the limitations set forth by Dr. David Applegate, Plaintiff could not perform her previous job as a telephone solicitor.  The VE opined that telemarketing is of a competitive nature and is not the type of job in which you can end a call and leave the work station whenever necessary. The VE indicated that according to Dr. Applegate's list of limitations, Plaintiff needed a series of accommodations from her employer.  First, according to Dr. Applegate, Plaintiff must have the ability to miss work so that she can manage the problems associated with her ileostomy.  Additionally, Dr. Applegate noted that Plaintiff would need to be able to take breaks from sitting and/or standing after thirty minutes. The VE interpreted  that this need would require Plaintiff to leave the work station.  Third, the VE interpreted Dr. Applegate's discussion of Plaintiff's need for access to a bathroom to mean that Plaintiff would need an accommodation because it would require her to be able to leave when needed.  In the VE's opinion, there was no work that Plaintiff could perform if she worked in accordance with Dr. Applegate's limitations (Tr. 310-312).

## **MEDICAL EVIDENCE**

### **Medical Evidence Relating to Plaintiff's Ileostomy**

In 1975, Plaintiff had an ileostomy (Tr. 139).  In June 2003, Plaintiff complained of redness around the stoma site (Tr. 201).  In August 2003, Plaintiff complained of pinching at the site (Tr. 199).  In September 2003, Dr. Applegate reported that the ostomy site was ok (Tr. 198).  From 2003 until 2006, Dr. Applegate did not record any significant issues with the ileostomy (Tr. 185- 202).  In fact, on February 17, 2006, Dr. Applegate noted that Plaintiff looked great and doing well (Tr. 185).

On November 6, 2007, Plaintiff told Dr. Applegate that she needed to change her stoma supplies once or twice daily, rather than only once weekly (Tr. 184). On December 7, 2007, Dr. Applegate noted that Plaintiff was reusing her stoma pouches and that was causing problems (Tr. 182). On April 4, 2008, Dr. Applegate noted that the stoma site was oozing occasionally (Tr. 181).

**Medical Evidence Relating to Plaintiff's 2002 Motor Vehicle Accident**

Plaintiff visited the emergency room on June 12, 2002 due to right arm pain sustained in a motor vehicle accident (Tr. 130). The emergency room physician recommended compresses and imposed restrictions at work.

On September 2, 2002, Plaintiff began attending occupational therapy to treat the right biceps tendonitis (Tr. 133). The therapy did help to decrease the pain, however, some pain from the accident did persist (Tr. 134).

On September 4, 2002, Plaintiff was evaluated by Dr. Alayne K. Sundstrom, a sports medicine specialist, who opined that Plaintiff had right biceps tendinitis. Dr. Sundstrom recommended physical therapy and prescribed Celebrex (Tr. 257-258).

On September 9, 2002, October 15, 2002, December 4, 2003, and December 23, 2003, Plaintiff reported an improvement in her arm pain, but complained of numbness in the fingers of her right hand. The results from three subsequently administered electromygograms and nerve conduction velocity tests showed no abnormalities (Tr. 250-256). While Plaintiff's arm pain had improved, she complained of posterior shoulder pain on December 23, 2003 (Tr. 252). Dr. Sundstrom prescribed Vicodin and a Medrol Dosepak, and recommended that Plaintiff undergo physical therapy treatments for her shoulder (Tr. 252).

On January 13, 2004, Dr. Sundstrom referred Plaintiff to Dr. Thomas E. Baker, an orthopedic surgeon

8

and sports medicine specialist (Tr. 250).  On January 29, 2004, Plaintiff saw Dr. Baker who identified a paralabral cyst along the anterior labrum, which suggested the existence of a labral tear and some shoulder joint problems.  Clinically, Plaintiff had rotator cuff tendinitis with impingement (Tr. 249).  Dr. Baker gave Plaintiff a cortisone injection (Tr. 249).  In subsequent visits with Dr. Baker, in February, March, April, and June of 2004, Plaintiff reported that the pain had improved (Tr. 245-248).  However, on September 16, 2004 and January 27, 2005, Plaintiff complained to Dr. Baker of increased shoulder pain (Tr. 243-244). Plaintiff elected not to have surgery (Tr. 243).

**Medical Evidence Relating to Plaintiff's Mental Functioning**

In July 2002, Plaintiff underwent a psychiatric review (Tr. 143).  Her impairments were not considered severe in nature (Tr. 143).  Dr. Leslie Rudy diagnosed Plaintiff with depression and anxiety; however, there was no evidence of functional limitations for her daily activities; for social functioning; for her ability to maintain concentration, persistence, and pace; and for episodes of decompensation (Tr. 146, 148, 153). Plaintiff was not given any clinical diagnosis.  Plaintiff's impairments were not considered severe as evidenced by her functioning (Tr. 155).

After conducting a clinical interview on May 1, 2006, Dr. Sudhir Dubey, Ph. D., a psychologist, opined that Plaintiff had the mental ability to relate to others; understand, remember, follow instructions; withstand stress and the pressures of day-to-day work activity; and manage her own finances (Tr. 138, 142). Dr. Dubey further opined that Plaintiff's global assessment of functioning was indicative that Plaintiff had some meaningful interpersonal relationships and some mild symptoms (ex: depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning pretty well.  *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, AMERICAN PSYCHIATRIC ASSOCIATION, 4th ed. 1994.

9

**Medical Relating to Plaintiff's Diabetes**

Plaintiff was diagnosed with diabetes in October 2005 (Tr. 93).  In both 2006 and 2008, blood tests revealed that Plaintiff's diabetes was not under control (Tr. 213, 222).

**Medical Evidence Pertaining to Plaintiff's 2007 Motor Vehicle Accident**

Plaintiff visited the emergency room again on July 6, 2007, after another motor vehicle  accident (Tr. 159).  She complained of low back pain and bilateral hip pain and rated her pain level at a ten on a scale from one to ten (Tr. 159).  X-rays of Plaintiff's cervical and thoracic spine showed no fracture or subluxation (Tr. 161).  No acute abnormality was observed (Tr. 162).  Upon discharge, Plaintiff was prescribed Percocet for pain and advised to follow up with her family physician (Tr. 162).

After her car accident, Plaintiff commenced physical therapy on August 7, 2007 for two to three times weekly during a four to six-week period.  Plaintiff's program included postural strengthening/stretching exercises, lumbar stabilization, and an introduction to a home exercise program (Tr. 163, 164).  After approximately one month of treatment, on September 6, 2007, the physical therapist noted that the therapy did not seem to have helped Plaintiff (Tr. 166).

On September 11, 2007, as a result of her persistent back pain, Plaintiff had a magnetic resonance imaging (MRI) of her cervical spine administered, which concluded that she had a possible cervical strain and a minimal diffuse disc bulge at C5-C6.  The MRI showed no focal disc protrusion or other focal abnormality (Tr. 168).  Plaintiff also had an MRI of her lumbosacral spine, which concluded that she had a central and right paracentral disc protrusion,  mild discogenic disease at L3-L4 and mild discogenic disease with a focal left-sided disc protrusion at L5-S1 (Tr. 169).  The MRI showed no fracture or other focal osseous abnormalities (Tr. 169).

During Plaintiff's   return visit on August 15, 2007, Dr. Baker found the results from an

electromyogram revealed a right C-6 radiculopathy, but no other abnormalities.  It was his opinion that no additional orthopedic measures were necessary (Tr. 241).

Dr. Ephraim K. Brenman, a specialist in pain medicine and physical medicine and rehabilitation, examined Plaintiff on September 18, 2007 to deal with the pain from her car accident (Tr. 177).  He recommended that Plaintiff undergo interventional treatments involving facet joint medial branch blocks to determine if the facet joints were causing Plaintiff's pain (Tr. 179).  Additionally, Dr. Brenman suggested that Plaintiff consider radiofrequency neurotomy and prescribed Valium and Percocet (Tr. 179).


Plaintiff saw Dr. Brenman again on September 28, 2007 (Tr. 176).  He noted that Plaintiff canceled the medial branch block and did not want to undergo the radiofrequency neurotomy because she feared it would affect her ileostomy (Tr. 176).  Instead, Plaintiff opted to pursue chiropractic treatment and wanted to change pain medications (Tr. 176).  Dr. Brenman placed Plaintiff on a different form of Vicodin and said that she was free to see a chiropractor (Tr. 176).  On October 24, 2007, Plaintiff reported to Dr. Brenman that the chiropractic visits were increasing her pain, that she had trouble getting up and out of her chair, and that Percocet was the only medication that relieved her pain (Tr. 175).  Dr. Brenman proscribed a Lidoderm patch and Percocet (Tr. 175).

**Medical Evidence Relating to Dr. Applegate's Opinion Regarding Plaintiff's Need for Benefits**

On February 1, 2008, Dr. Applegate wrote a letter to the attorney  representing Plaintiff at that time regarding Plaintiff's health condition (Tr. 172).  Dr. Applegate stated that Plaintiff approached him about applying for disability in 2003, but that he expected her health to improve and discouraged her from applying (Tr. 172).  At the time of the letter, however, Dr. Applegate made clear that he believed that Plaintiff should apply for disability because her health conditions negatively affect her ability to engage

in work-like activities as she is limited in her ability to sit, stand, walk, and lift (Tr. 173).  In addition, Dr. Applegate noted that her conditions required her to have regular medical appointments, appointments for acute and unplanned complications and normal prevention appointments.  In an employment environment, Plaintiff needed access to a bathroom so that she could change her stoma bag at a moment's notice (Tr. 173).

On July 1, 2008, Dr. Applegate prepared a statement on Plaintiff's medical status for the attorney that was representing Plaintiff at that time (Tr. 170).  Dr. Applegate reiterated that Plaintiff's conditions required her to have regular, unplanned, and prevention medical appointments and required her to be able to change her stoma bag whenever necessary (Tr. 171).  Dr. Applegate explained that Plaintiff was having complications from her stoma; her chronic low back pain and degenerative disk disease were stable, her diabetes was not controlled, her psoriasis had slightly improved; her moods had improved; her blood pressure was in excellent condition; and her weight was being addressed (Tr. 170).

## STANDARD FOR DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case and are found at 20 C. F. R. § 404.1520 and 20 C. F. R. § 416.920, respectively. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a disability.  *Id.* (*citing* 42 U.S.C. § 423(a) and (d), *See also* 20 C. F. R. § 416.920).  A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

12

To determine disability, the Commissioner has established a sequential evaluation process for disability determinations.  20 C. F. R. § 404.1520 (a)(4) (Thomson Reuters 2010).

First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled.  20 C. F. R. §§ 404.1520 (a)(4)(i) and 416.920(a)(4)(i) (Thomson Reuters 2010).

Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled.  20 C. F. R. § § 404.1520 (a)(4)(ii) and 416.920(a)(4)(ii) (Thomson Reuters 2010).

Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments.  If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded.  20 C. F. R. § § 404.1520 (a)(4)(iii) and 416.920(a)(4)(iii) (Thomson Reuters 2010).

Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. 20 C. F. R. §§ 404.1520 (a)(4)(iv) and 416.920(a)(4)(iv) (Thomson Reuters 2010).

Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform.  20 C. F. R. § § 404.1520 (a)(4)(v) and 416.920(a)(4) (iv) (Thomson Reuters 2010).

## **THE ALJ'S FINDINGS**

The ALJ made the following findings:

1.     Plaintiff last met the insured status requirements of the Act on December 31, 2007.

2.     Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of July 31, 2002, through her date last insured of December 31, 2007 (20 C. F. R. § 404.1571

13

*et seq.*).

3.     Through the date last insured, Plaintiff had the following severe combinations of impairments: history of ulcerative colitis status post 1975 iliostomy; mild cervical and lumbar degenerative changes; diabetes mellitus; right shoulder arthritis; obesity; and psoriasis (20 C. F. R. § 404.1521 *et seq.*).

4.     Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1 (20 C. F. R. §§ 404.1525 and 404.1526).

5.     Based upon careful consideration of the entire record, through the date last insured, Plaintiff had the residual functional capacity to perform a range of sedentary work as defined in 20 C. F. R. § 404.1567(a).  Specifically, she retained the ability to sit for 30 minutes at a time for a total of eight hours during a workday and stand/walk 30 minutes at a time for a total of two hours during a workday.  She had no difficulty with handling or fingering, or operating hand and foot controls, but she could not use her right arm for overhead reaching.  She could occasionally bend, stoop and squat.  She could not crawl or climb ladders or scaffolds.  She could not work at unprotected heights or around hazardous machinery.  She was not otherwise functionally limited.

6.     Through the date last insured, Plaintiff was capable of performing her past relevant work as a telephone solicitor.  This work did not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity (20 C. F. R. § 404.1565).

7.     Plaintiff was not under a disability, as defined in the Act, at any time from July 31, 2002, the alleged onset date, through December 31, 2007, the date last insured (20 C.F.R. § 404.1520(f)).

(Tr. 13-29).

## STANDARD OF REVIEW

This Court exercises jurisdiction over review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383 (c)(3).  *McClanahan v. Commissioner of Social Security*, 474 F.3d 830, 832-33 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*see Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The decision must be affirmed if the ALJ's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.

14

Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept.  *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983) (*quoting Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  Furthermore, the court must defer to an agency's decision.  Even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.  *Id.* (*citing Key, supra*, 109 F.3d at 273).

## DISCUSSION

Plaintiff requests that this Court reverse the Commission's finding and she presents two reasons for doing so.  First, the ALJ did not articulate a valid basis for rejecting the opinion of Dr. Applegate, a treating source.  Second, the ALJ did not have substantial evidence to find that Plaintiff could do her past relevant  work.  Defendant argues that substantial evidence demonstrates that the ALJ properly weighed the medical opinions in the record.  In addition, Defendant claims that substantial evidence also supports the ALJ's finding that Plaintiff was capable of performing her past relevant work as a telemarketer.

### 1.    DID THE ALJ ARTICULATE A VALID BASIS FOR REJECTING DR. APPLEGATE'S OPINION?

Plaintiff argues that the only discrepancy between the testimony of the treating source, Dr. Applegate, and the testimony of the ME, was the ME's opinion that the issues regarding her stoma site were a result of her inappropriate reuse of the stoma bags.  Dr. Applegate listed Plaintiff's need to change her stoma bag at a moment's notice as a limitation that would interfere with her ability to work (Tr. 173).  However, the ME did not list this need as a limitation.  The ME opined that Plaintiff would not have the problems associated with her stoma site if she followed her physician's orders and did not reuse the stoma bags (Tr. 306-308).  As a result, Plaintiff asserts that the ALJ incorrectly adopted the opinion of the ME and did not give the opinion of Dr. Applegate, as the treating source, the deference it deserved ( Docket No. 13, p.  8-11).

15

The ALJ did reject the opinion of Dr. Applegate as unpersuasive (Tr. 23).  The ALJ found that Dr. Applegate's opinion that Plaintiff's ileostomy was a limitation, was based on subjective complaints of the Plaintiff.  The ALJ opined that Dr. Applegate's opinions were not supported with medical findings that the complications were of such significance on a sustained basis as to interfere with the Plaintiff's ability to perform work (Tr. 23).  The ALJ noted that Plaintiff did not have significant issues with her stoma site until she started reusing the stoma pouches.  As a result, the ALJ discounted the opinion of Dr. Applegate and adopted the opinion of Dr. Davis (Tr. 23).

The Sixth Circuit has observed that where the Commissioner's decision to reject a claimant's disability application is otherwise supported by substantial evidence, reversal will nonetheless be required if the agency fails to follow its own procedural regulation requiring the agency to give good reasons if it fails to give weight to a treating physician's opinions in the context of a disability determination.  *Woodard v. Astrue*, 2009 WL 2065781, *5 (M. D. Tenn. 2009) (*citing Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004) (*citing* 20 C. F. R. § 404.1527(d)(2)).  An ALJ must give the opinion of a treating source controlling weight if he or she finds the opinion to be well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in the case record.  *Id.*

When the opinion of a treating source is not accorded controlling weight, an ALJ must consider such factors as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source in determining what weight to give the opinion.  *Id.* (*citing Harris v. Heckler,* 756 F.2d at 431, 431-435 (6th Cir. 1985).  This requirement of reason-giving exists to (1) enlighten a claimant who knows that his or her physician has deemed him or her disabled, (2) ensure that the ALJ properly applied the treating physician rule and (3) permit meaningful review of the ALJ's application of the

16

rule.  *Id.* (citations omitted ).

The ALJ considered the length of the treatment relationship and the nature and extent of the treatment relationship.  The ALJ referred to Dr. Applegate as Plaintiff's treating family practitioner; thus, the ALJ clearly viewed Dr. Applegate as the treating source (Tr. 23).  The ALJ also considered the supportability and consistency of Dr. Applegate's opinion with the record as a whole.  The ALJ noted that Dr. Applegate's records did not document prolonged difficulty at the stoma site, nor did the record show that the ileostomy created a significant problem on a sustained basis (Tr. 23).  Thus, the ALJ did not find Dr. Applegate's opinion to be supported by and consistent with the record as a whole.  In the opinion, the ALJ referred to Dr. Applegate as a family physician and noted, during a discussion of Plaintiff's mental health, that Dr. Applegate is not a mental health practitioner or specialist (Tr. 19).  Review of the ALJ's opinion demonstrates  that he did consider whether Dr. Applegate specialized in any area of medicine and is evidence that the ALJ did not believe Dr. Applegate to have a specialty, but to be a practitioner of general medicine.

The opinion further illustrates that the ALJ did properly regard Dr. Applegate as the treating source, but for other reasons, mainly that his opinion was not supported by or consistent with the record as a whole, did not find Dr. Applegate's opinion to be persuasive and deserving of the deference that a treating source is typically accorded.  The ALJ supported this belief with a discussion of Plaintiff's testimony and the medical evidence.  The ALJ noted that Plaintiff recorded her onset date of disability as July 31, 2002, but she had no serious documented issues with her stoma site in 2003, 2004, 2005, or 2006.  In fact, in October 2005 and January 2006, Dr. Applegate stated that the Plaintiff was doing well and looks great (Tr. 24).  Between February 2006 and November 2007, Dr. Applegate did not examine Plaintiff as would be expected if Plaintiff was having significant problems (Tr. 25). It was not until Plaintiff's second motor vehicle accident, in July 2007, that Dr. Applegate began consistently recording problems with the stoma site (Tr. 25).

The Magistrate finds that the ALJ fulfilled his duty to consider Dr. Applegate's opinions, attributed the relative weight to the opinions and then provided an adequate explanation as to why Dr. Applegate's opinion was not supported by and consistent with the record.  Accordingly, the ALJ had substantial evidence to reject Dr. Applegate's opinion and the opinion of the ME.  In doing so, the ALJ evaluated Plaintiff's claim from the standpoint that Plaintiff would not be limited by a need to attend to her stoma site at a moment's notice.  The ME believed that if Plaintiff had properly changed her stoma bag as prescribed, she would not have to deal with the problems associated with her stoma site (Tr. 23).  Plaintiff argues that she is not non-compliant, but that she cannot afford to change her stoma bags.  The ALJ did discuss Plaintiff's financial situation and regarded it as a Catch-22, that Plaintiff could afford the supplies if she were working (Tr. 23 n.4).  Additionally, the ALJ noted that Plaintiff's husband was employed and Plaintiff did not apply for Supplemental Security Income, presumably because she does not meet the financial eligibility requirements.  Therefore, the ALJ did give consideration to Plaintiff's reason for not following Dr. Applegate's prescribed plan but did not find that the evidence justified her non-compliance.

The Magistrate also finds that the ALJ did articulate a valid basis for rejecting Dr. Applegate's opinion and that there is substantial evidence in the record to support the ALJ's decision.

2.  **CAN PLAINTIFF RETURN TO HER PAST RELEVANT WORK?**

 The VE testified that a hypothetical person having the limitations set forth by Dr. Applegate could not competitively perform any of Plaintiff's past work (Tr. 311).  The VE opined that such limitations would not permit an individual to work as a telephone solicitor because such a job was not compatible with a need to use the bathroom whenever necessary (Tr. 312).  Plaintiff argues that it is inconceivable that the ALJ determined that Plaintiff could return to her past relevant work of telephone solicitation considering the need to use the bathroom frequently.

18

To be found disabled under the law, an individual (except for a title II widow, widower, or surviving divorced spouse, or a title XVI child younger than age 18) must have a medically determinable physical or mental impairment(s) of such severity that he or she is not only unable to do his or her previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  TITLES II AND XVI: A DISABILITY CLAIMANT'S CAPACITY TO DO PAST RELEVANT WORK, IN GENERAL 1982 WL 31386, *1, SSR 82-62 (1982).  The regulations provide a sequential evaluation process for determining disability.  *Id.*  In the fourth step of this process, consideration is given to the individual's capacity to perform past relevant work.  *Id.*  Past relevant work is work that has been done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn it.  *Wright-Hines v. Commissioner of Social Security,* 597 F.3d 392, 395 (6th Cir. 2010) (*citing* 20 C. F. R. § 404.1560(b)(1)).

Here, Plaintiff's work as a telephone solicitor was past relevant work because it was performed in the last 15 years.  Such work as a telephone solicitor constituted substantial gainful activity because Plaintiff earned $9,533 in 2001.  Plaintiff's work lasted long enough for her to learn how to do it as she held the job from 2000 to 2001 (Tr. 28, 29).  However, Plaintiff contends that it is impracticable for her to return to this past relevant work as she must use the bathroom "at a moment's notice."

Plaintiff admitted that she failed to change and/or clean the stoma as directed.  Occasionally, she changed her pouch once  weekly.  Dr. Applegate noted that frequent pouch reuse was the source of difficulty (182).  He warned Plaintiff that she needed to change her supplies once or twice daily (Tr. 184).  The ALJ surmised that although purchase of the supplies was a hardship, Plaintiff had alternate sources of income from which to purchase supplies as needed.  The inferences drawn from the record suggest that the need to use the bathroom at a moment's notice was the result of Plaintiff's use of supplies in a manner contraindicated by Plaintiff's

physician.  Since the ALJ's finding that Plaintiff is noncompliant in the reuse of her pouches is supported by substantial evidence, the Magistrate recommends that his decision be upheld..

### CONCLUSION

For the foregoing  reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the Magistrate.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   August 8, 2010




### NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed

appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.